# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

No. 18-CV-4899 (JFB)

---

**RUDOLPH BISNAUTH,**

Petitioner,

VERSUS

**ROBERT MORTON J.R.,**
SUPERINTENDENT OF THE DOWNSTATE
CORRECTIONAL FACILITY

Respondent.

---

**MEMORANDUM AND ORDER**
August 9, 2021

---

**FILED**
**CLERK**
1:41 pm, Aug 09, 2021
**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

JOSEPH F. BIANCO, Circuit Judge (sitting by designation):

Rudolph Bisnauth ("petitioner"), proceeding *pro se*, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction in New York state court on four grounds. On January 21, 2011, following a jury trial, the jury convicted petitioner of murder in the second degree. *See* N.Y. Penal Law § 125.25(2). Petitioner was thereafter sentenced to a term of imprisonment of twenty-five years to life.

In his instant habeas petition, petitioner challenges his conviction as unconstitutional because: (1) the State of New York (the "State") wrongfully impeached its own witnesses in violation of N.Y. Crim. Proc. Law. § 60.35; (2) the state court wrongfully denied petitioner's motion for a missing witness charge; (3) his conviction was both legally insufficient and against the weight of the evidence; and (4) the State suppressed evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (ECF No. 1 at 5-10.)

For the reasons discussed below, petitioner's request for a writ of habeas corpus is denied in its entirety.

## I. BACKGROUND

On January 21, 2011, a jury in the New York State Supreme Court, Suffolk County, found petitioner guilty of second-degree murder in violation of N.Y. Penal Law § 125.25(2). Following his sentencing, petitioner unsuccessfully moved the state

1

court to vacate the judgment of conviction and unsuccessfully pursued a direct appeal, as well as a motion under N.Y. Crim. Proc. Law § 440.10(1)(h), through the New York state courts. His petition to this Court followed.

## A. The Trial and Sentencing

Over the course of petitioner's trial, the State presented evidence implicating petitioner in the murder of Jerry Armstrong, including the testimony of over a dozen fact witnesses and multiple experts. The evidence established that, on the morning of June 1, 2009, a verbal dispute arose between Timothy Rich and his partner Keana Byrd, the daughter of the victim, Jerry Armstrong. Following the verbal altercation, the dispute escalated, with members of the Byrd/Armstrong family and the Rich family proposing a fistfight. Rather than a fistfight, however, the interfamily argument ended that night in the shooting death of Jerry Armstrong by Timothy Rich's friends, Michael McKenzie and petitioner.[1]

### 1. The Verbal Dispute

On the morning of June 1, 2009, Keana Byrd spotted Timothy Rich, the father of her daughter, driving his car with another woman in the front passenger seat. (A. 33-36.)[2] After following Timothy Rich and noticing that this woman was seven-months' pregnant, Ms. Byrd called Timothy Rich and threatened to cancel the car's insurance, which was registered and insured by Ms. Byrd. (A. 36-37, 361-64.) According to Ms. Byrd, Timothy Rich then threatened her, stating that he and his sister

would beat her up if she canceled the insurance. (A. 38, 363-64)

Following the call, Timothy Rich and his sister drove to Ms. Byrd's house around 5 p.m., and his sister "mushed" Ms. Byrd in the face. (A. 39-41, 363-65.) The altercation did not escalate further because Timothy Rich grabbed his sister and because Ms. Byrd left her own house to travel to her sister's house at 119 Irving Avenue in Wyandanch, New York. (A. 41-42, 364-65.) Timothy Rich and his sister left Ms. Byrd's house around that same time as well. (A. 365-66.)

At her sister's house, Ms. Byrd told her father, Jerry Armstrong, about the argument with Timothy Rich. (A. 43.) At her father's request, Ms. Byrd called Timothy Rich and the parties agreed that her father would retrieve the license plates for the car after the weekend and that Timothy Rich could continue to see his daughter. (A. 45-46, 367-69.) According to Timothy Rich, that phone call resolved the dispute. (A. 368.)

### 2. The Proposed Fistfight

Shortly after the phone call, however, several individuals who had learned about the dispute, including Ms. Byrd's brothers Jerry "Montreal" Byrd and Darryl Byrd, sought out and located Timothy Rich in front of his home and attempted to fight with him. (A. 90-91, 145, 369-70.) Timothy Rich, however, fled in his car to his sister's house at 29 Parkway Boulevard in Wyandanch, while Montreal Byrd and others returned to 119 Irving Avenue at around 9 p.m. (A. 90-91, 118, 146, 370-71.)

---

[1] McKenzie pleaded guilty to manslaughter in the first degree prior to the commencement of petitioner's trial, *see* N.Y. Penal Law § 125.20, and was sentenced to twenty-five years' imprisonment followed by five years of supervised release. *See*

*People v. McKenzie*, 98 A.D.3d 749, 749 (2d Dep't 2012), *appeal denied*, 20 N.Y.3d 987 (2012).

[2] References to the state court record on appeal will be cited as "A. [page number]." The record is available on the docket for this case. (*See* ECF Nos. 11, 11-1, 11-2.)

At 29 Parkway Boulevard, Timothy Rich explained to his friends about the altercations with the Byrd/Armstrong family earlier that day. (A. 238-40, 300-01, 371-72.) Among those present were petitioner, his cousin Shawn Bisnauth, McKenzie, Dajaun Pottur, and Anthony Rich. (A. 237-38, 298-300, 370-72.) Timothy Rich thereafter called Ms. Byrd and said he would fight her brother, Montreal. (A. 48-49.) However, after driving to 119 Irving Avenue and realizing that his daughter was present, Timothy Rich returned to 29 Parkway Boulevard and phoned Ms. Byrd, calling off the fight. (A. 93-94, 376-77.) Montreal Byrd joined the call and accused Timothy Rich of being afraid to fight. (A. 93-94, 377.) Both men then challenged each other to fight at the other's location. (A. 377.)

### 3. The Shooting and Aftermath

After Montreal Byrd left the call, Timothy Rich warned Ms. Byrd that his friends were "going to come shoot the house up" and to get the kids out of the house. (A. 378; *see also* A. 53-54.) Petitioner, his cousin Shawn Bisnauth, McKenzie, Pottur, and Anthony Rich then drove to 119 Irving Avenue at around 11:30 p.m. to "shoot . . . up" the house. (A. 169, 241-42, 301-02, 378-79.) Once at 119 Irving Avenue, petitioner, McKenzie, and Anthony Rich exited the car and approached the residence, with McKenzie carrying a handgun. (A. 242-45, 303-05.) Shawn Bisnauth and Pottur remained in the car. (A. 264.) According to Anthony Rich, as they walked into the front yard, McKenzie yelled "what's popping?" and started shooting at a small crowd of people standing in front of the house. (A. 305, 308.)

One of the bullets hit and ultimately killed Jerry Armstrong—Ms. Byrd's father. (A. 59-61, 97-99, 121-22, 150.)

Both Anthony Rich and Pottur testified that there were two sets of gunshots. (A. 267, 308-09.) An off-duty police officer who lived nearby also testified that she heard two sets of gunshots. (A. 169-70.) Specifically, the officer heard three shots and a pause, followed by seven or eight additional shots. (A. 169-70.) Several Byrd/Armstrong family members and friends also reported two sets of gunshots. (A. 55, 59, 97-99, 119-22.)

According to Anthony Rich, there were two sets of gunshots because the gun jammed—and McKenzie in fact said, "[S]h*t the gun jammed." (A. 309.) Anthony Rich further testified that he witnessed petitioner and McKenzie tussle with the gun—"pulling the gun back and forth"—until the gun unjammed. (A. 309-10.) Pottur similarly testified that, after the first round of gunfire, he heard petitioner and McKenzie arguing and "assumed" that the gun had jammed. (A. 245, 267, 281-85.)

Although Anthony Rich saw McKenzie take the gun after it was unjammed, he was unclear as to who fired the second set of gunshots. (A. 266, 309-12.) When petitioner and McKenzie returned to the car, however, McKenzie carried the gun and announced that he had "had" the victim. (A. 245, 275.)

After the shooting, the men returned to an abandoned house at 18 Parkway Boulevard and recounted the event. (A. 257-58, 277-78.) According to Timothy Rich, McKenzie said that he shot the gun, and petitioner said that he unjammed the gun, that a shot fired in the process, and that he fired off another shot before McKenzie "snatched the gun" back. (A. 382-83.)

The follow day, according to Timothy Rich's girlfriend (Kimberly Daniels), petitioner again stated that he took the gun from McKenzie and unjammed it before

3

McKenzie fired again. (A. 348.) In addition, Wilfred Stevens, who had a relationship with petitioner's mother, testified that petitioner said that he was "involved in a shooting" where he "sprayed up [a] house" and asked Stevens, "[H]ow long does it take for gun powder to come off your hand?" (A. 430-31.) Stevens also testified that petitioner said he cleaned and disposed of the gun. (A. 431.)

#### 4.  The Police Investigation

Following the shooting, police recovered ten shell casings and one unfired cartridge from near the property at 119 Irving Avenue. (A. 479-83, 597-98.)    A bullet was also recovered from Jerry Armstrong's body. (A. 231, 577.)

According to the State's forensics expert, all of the bullets and casings were ejected from the same gun which, based on a distinctive firing pin mark, made it likely that the gun was a nine-millimeter, semi-automatic pistol known as a Glock. (A. 598-602, 605.) He further testified that an unfired cartridge, like the one recovered on the property, could be ejected from the gun in order to clear a jam. (A. 625.)

During their testimony, Anthony Rich and Pottur explained that McKenzie had permanently "disabled" his right hand in a childhood car accident. (A. 242-43, 314.) A police detective corroborated this evidence, similarly testifying that, following McKenzie's arrest, McKenzie's right hand could not be scanned for fingerprints because it could not lie flat. (A. 551-54.) According to the State's forensics expert, it would be "virtually impossible" to clear a jam with one hand. (A. 625-26.)

#### 5.  The Defense Case

In response to the State's case, petitioner introduced a crime scene video into evidence and called Officer Ronald Breuer to testify that, while riding in the ambulance with Jerry Armstrong, he asked Armstrong who shot him and Armstrong answered that it was "[m]y daughter's boyfriend." (A. 677, 679-81, 687.)

#### 6.  The Verdict and Sentencing

After about four hours of deliberations, the jury return a verdict of guilty, convicting petitioner of depraved indifference murder in violation of N.Y. Penal Law § 125.25(2). (A. 868.)  Petitioner was thereafter sentenced to a term of imprisonment of twenty-five years to life and judgment was entered on March 15, 2011. (ECF No. 10 at 1.)

Following sentencing, petitioner filed a notice of appeal from his judgment of conviction on March 18, 2011. (*Id.* at 9.)

### B.  Relevant Motions and Objections During Trial

#### 1.  Motions and Objections regarding Admissibility of Prior Statements

This petition argues that certain testimony by Dejaun Pottur and Anthony Rich involved the improper admission of prior statements under N.Y. Crim. Proc. Law § 60.35.    The portions of the record relating to that issue are summarized below.

##### a.  Dejaun Pottur

As noted *supra*, the evidence at trial established that, following the shooting, petitioner and the other men returned to an abandoned house at 18 Parkway Boulevard. During his direct testimony, the State asked Dejaun Pottur, "What was said by [petitioner] Rudy Bisnauth in front of that house?" (A. 259.) In response, Pottur stated, "Nothing." (A. 259.)  The State thereafter attempted to refresh Pottur's recollection, asking if he remembered previously giving a statement to the police, and then seeking to show him his

July 9, 2009 statement to the police. (A. 259-62.) Defense counsel requested a sidebar, where he objected and argued that this was a prior inconsistent statement meant to impeach the witness and, contrary to the State's argument, was not an attempt to refresh his recollection because Pottur "didn't say he needed his memory refreshed." (A. 259-63.) The court rejected this objection because defense counsel "just started objecting" before the State "asked any foundational questions" (A. 260-61), and therefore did not require an offer of proof by the State (A. 263). The State, however, did not pursue the line of questioning further during its direct examination.

On cross-examination, in an attempt to impeach Pottur, defense counsel elicited the fact that Pottur previously told the police on the day after the shooting (June 2) that McKenzie fired nine to ten shots. (A. 278-79.) On re-direct, Pottur testified that, during the shooting, he "heard a fuss" and "assum[ed]" the gun jammed. (A. 281.) The State then attempted to refresh Pottur's recollection by again asking about his July 9 statement to police. (A. 281.) Although the State started to read part of his statement—"And telling the police that the gun jammed that that's what Rudy . . ."—Pottur interjected that he gave that July 9 statement because "the word already went around that the gun jammed." (A. 281.) The State then asked Pottur to review "the statement and see if that refreshes your recollection." (A. 281-82.) Defense counsel objected, arguing that the question went beyond cross-examination into a "whole new area." (A. 282.)

The court overruled the objection and Pottur reviewed his previous statement. (A. 282-83.) Pottur then testified that following the first round of shots by McKenzie, "the gun jammed," he heard an argument between McKenzie and petitioner, and he heard a second round of gunshots,

although he did not see who fired the second round. (A. 283-84.) During re-cross-examination, defense counsel asked whether Pottur knew whether the gun jammed, to which he replied again that he "assumed" it jammed. (A. 284-85.) The defense then moved for a mistrial because the State went beyond the scope of cross-examination and because they impeached their own witness with his July 9 statement. (A. 286-87.) The court denied the motion. (A. 287.)

On the following day of trial, defense counsel requested that the court give a limiting instruction to the jury—that is, that the jury can only consider the July 9, 2009 statement to assess the credibility of the witness, but not for the truth of the matter asserted—because the State allegedly impeached Pottur. (A. 291.) The court denied the request, but offered to consider any proposed instruction during the final charge to the jury at the end of case. (A. 292.)

#### b. Anthony Rich

During direct examination, the State elicited significant testimony regarding the shooting—including that petitioner and McKenzie together tussled with the gun until it unjammed (A. 310)—but it did not seek testimony regarding Anthony Rich's previous statements to police. On brief cross-examination, defense counsel asked whether Anthony Rich, in his sworn statement to police on July 7, 2009, had stated that he saw McKenzie with the gun on his lap as the group drove to the abandoned house after the shooting. (A. 327.) Anthony Rich stated that he could not recall. (A. 327.)

On re-direct, the State asked whether Anthony Rich told police in his July 7 statement that petitioner "had grabbed the gun and un-jammed it." (A. 328.) Defense counsel twice objected to introduction of that

statement, but the court overruled the objections, agreeing with the State that the defense had opened the door to the statement. (A. 328-30.) Anthony Rich testified that he signed his July 7 statement and that it in fact said that petitioner "grabbed the gun and un-jammed it," but also that he "never said that" to police even though he signed the statement. (A. 330.) He then testified again that he saw petitioner and McKenzie "both had their hands on the gun," while they were tussling to unjam it. (A. 330.) The State then asked Anthony Rich whether he was familiar with what to do when a gun jams, to which he replied, "I watch [television]." (A. 331-32.) Defense counsel objected and the court sustained the objection, which concluded the re-direct. (A. 332.) The jury was then excused for lunch. (A. 332.)

After the jury was excused, defense counsel explained to the court that the State had wrongfully impeached Anthony Rich in violation of N.Y. Crim. Proc. Law § 60.35. (A. 333.) Specifically, defense counsel argued that he had the right to impeach Anthony Rich with a prior inconsistent statement in the July 7 document without opening the door to all statements in that document and that he did not even impeach the witness. (A. 333-34.) Defense counsel requested that the court provide a contemporaneous limiting instruction to the jury regarding Anthony Rich's testimony, and renewed his request for a similar instruction as to Pottur. (A. 334.) The State responded that the court need only give that particular charge during jury instructions at the end of the trial. (A. 335.)

Following the lunch recess, before the jury was called in, defense counsel argued that Anthony Rich's July 7 statement should not have been permitted at all because it was not a prior inconsistent statement—that is, it did not tend to disprove his direct testimony. (A. 338-39.) Defense counsel further argued that, in

any event, Section 60.35 requires the court to issue a limiting instruction regarding Anthony Rich's testimony. (A. 339.) Defense counsel also reiterated that such instruction should have been issued regarding Pottur's testimony. (A. 339.)

The court again indicated that it would consider defense's request for an instruction with respect to Pottur in its final charge. (A. 339.) After the jury returned, the court read them a limiting instruction, explaining that the State's questions regarding Rich's July 7 statement were permitted for the sole purpose of assessing the credibility of Rich's trial testimony, and "is not, repeat, not legal evidence in this case." (A. 340-41.) The State then called it next witness. (A. 341.)

\* \* \*

At the charge conference following the close of evidence, defense counsel renewed his request for a general instruction regarding prior inconsistent statements and requested that the court not single out Anthony Rich and Pottur by name. (A. 694-95.) The court stated that it would take the request into consideration. (A. 697.)

During summations the following day, the State mentioned Anthony Rich's testimony regarding the gun "jamming" or "un-jamming," and argued that "based upon not only the testimony, but the physical evidence, . . . th[e] gun jammed" and that "it was Rudy Bisnauth that cleared the gun, and may have fired it or may have given it back to [McKenzie] to fire." (A. 759, 768) The State referred to the gun jamming throughout summation.

Following summations, the court charged the jury regarding, among other things, evaluating witness credibility. The court stated that it should ask, "Was the testimony of the witness consistent or inconsistent with other

6

testimony or evidence in the case?"  (A. 801.)
It further stated that:

> You may also consider whether a
> witness made previous statements that
> are inconsistent with his or her
> testimony at trial.
>
> If a witness has made such
> inconsistent statements or omissions,
> you may consider whether and to what
> extent they affect the truthfulness or
> accuracy of that witness's testimony
> here at trial.
>
> The contents of a prior inconsistent
> statement are not proof of what
> happened.  You may use evidence of
> a prior inconsistent statement only to
> evaluate the truthfulness or accuracy
> of the witness's testimony here at trial.
>
> You will recall during this trial, you
> heard testimony regarding prior
> statements of two witnesses, Dajaun
> Pottur and Anthony Rich.  I instruct
> you at this time with respect to
> Anthony Rich as I have instructed you
> at the time with respect to Anthony
> Rich, I now instruct you as to both
> witnesses, evidence regarding any
> prior statement of these witnesses was
> admitted not for the truth of what was
> contained in the prior statement, but
> for the sole purpose of assisting you in
> evaluating the credibility of those
> witnesses here at trial.  If you are
> satisfied that such prior statements
> were, in fact, made by this witness and
> that such prior statements were, in
> fact, inconsistent with their testimony
> here in Court, you may consider such
> inconsistency as it may reflect upon
> the witness's testimony here in Court.

(A. 803-05.)

### 2. Motion for Judgment of Acquittal due to Insufficient Evidence

After the State rested its case-in-chief, the defense moved for dismissal of the indictment because the State allegedly failed to establish the elements of depraved indifference murder. (A. 645.) Specifically, defense counsel argued that the law required petitioner to have the same *mens rea* as McKenzie (who pleaded guilty to intentional manslaughter) and argued that that was not possible in the instant case because the State was only seeking conviction on the depraved indifference murder charge against petitioner. (A. 646.) The court summarily denied the motion. (A. 647.)

### 3. Motion For Missing Witness Instruction

During the trial, defense counsel also moved for a missing witness charge as to McKenzie. (A. 647-48.) Defense counsel argued that McKenzie was under the State's control because they had a plea agreement with him, but the State failed to call him as a witness. (A. 647-48.)

The State responded that McKenzie, as a convicted defendant, was not under its control and had the same constitutional right not to incriminate himself as petitioner, and thus the motion was without legal basis. (A. 649-50.) Defense counsel further argued, however, that McKenzie could not incriminate himself because he had already accepted a guilty plea. (A. 650.)

The court then stated that, if either party sought a specific jury charge on this issue, such a request needed to be put in writing before the case was submitted to the jury. (A. 650.)

After the defense rested, defense counsel renewed his motion for judgment of acquittal and his motion for a missing witness

instruction, which the court denied. (A. 689.) At the charge conference, however, defense counsel requested that the court include McKenzie's name in its charge with respect to accessory liability (A. 692-93), which the court granted (A. 699). Defense counsel also objected to the proposed instruction, which stated that the jury is not permitted to consider the status of McKenzie in its deliberations. (A. 692-93.) The court overruled that objection. (A. 700.)

During closing, however, defense counsel made reference—over at least six sustained objections—to the absence of McKenzie from the State's case-in-chief. (A. 704-05, 710-11, 725, 734.)

During the charge to the jury, the court instructed the jury that it must not speculate on the present status of the person with whom petitioner acted in concert, and that it must not draw any inference from his absence or allow his absence to influence the verdict. (A. 829, 853-54.)

## C. Post-Judgment Procedural History

### 1. Motion to Vacate Judgment of Conviction Based on Alleged *Brady* Violation

On October 17, 2013, prior to perfecting his direct appeal, petitioner filed a motion to vacate his judgment of conviction under N.Y. Crim. Proc. Law § 440.10(1)(h), arguing that the State violated his state and federal constitutional rights when it failed to disclose *Brady* material prior to trial. (A. 873.) Specifically, petitioner argued that the State committed a *Brady* violation by not disclosing the existence of a cooperation agreement between their office and Timothy Rich from April 2008, more than a year before the death of Jerry Armstrong in June 2009. (A. 878.)

The State filed its opposition on February 14, 2014. (A. 1033.)

Following a two-day hearing and additional briefing by the parties, the court denied petitioner's motion on April 23, 2015. (A. 1169.) The court determined that the fact that Timothy Rich worked as a confidential informant should have been turned over to defense counsel because Timothy Rich was an active cooperator at the time the police detectives interviewed him and his status was known to the police detectives who questioned him. (A. 1167.) The court, however, held that there was no "reasonable probability" that the outcome of the case would have changed had this information been disclosed to the defense. (A. 1168-69.) The court accordingly denied petitioner's motion. (A. 1169.)

### 2. Direct Appeal

Petitioner sought a certificate granting leave to appeal the denial, which was granted by the New York State Supreme Court, Appellate Division, Second Department, on August 3, 2015. (A. 1170.) On October 27, 2015, the Second Department also granted petitioner's motion to consolidate his appeal from the March 15, 2011 judgment of conviction with his appeal from the April 23, 2015 order denying his motion to vacate the judgment. (A. 1171.)

In his consolidated brief, petitioner argued that: (1) the State impeached its own witness in violation of N.Y. Crim. Proc. Law § 60.35 (and relatedly argued that the trial court failed to give a contemporaneous limiting instruction, the State improperly referred to these prior statements during summation, and petitioner received ineffective assistance of trial counsel when his counsel failed to object when the State introduced the impeaching material at trial); (2) the trial court improperly denied his request for a missing witness charge after

8

cooperating co-defendant, Michael McKenzie, did not testify at trial; (3) the jury verdict was against the weight of evidence because the State's witness, Winfred Stevens, lacked credibility; and (4) the court improperly denied his motion to vacate the judgment of conviction based on the alleged *Brady* violation. (ECF No. 11-2 at 19-20.)

On April 12, 2017, the Second Department affirmed petitioner's judgment of conviction. (*Id.* at 130-31.) The Second Department held that petitioner, "for the most part," failed to preserve its contentions that the State improperly impeached two of its witnesses, that the trial court failed to give a contemporaneous limiting instruction, and that the State improperly referenced the prior statements during summation. (*Id.* at 131.) The court concluded, in any event, that any error was harmless due to the overwhelming evidence of petitioner's guilt and the fact that there was no significant probability that any error contributed to his conviction. (*Id.*) It also concluded that petitioner was not deprived of effective assistance of counsel. (*Id.*) The Second Department further held that: (1) the trial court properly denied petitioner's request for a missing witness charge; (2) the verdict was not against the weight of evidence; and (3) the court properly denied petitioner's motion to vacate the judgment of conviction because there was no reasonable probability that such nondisclosure affected the outcome of the trial. (*Id.*)

On May 14, 2017, and through subsequent briefing, petitioner sought leave to appeal to the New York Court of Appeals, repeating his various arguments regarding the State's wrongful impeachment of its witnesses, the missing witness charge, the weight of evidence, and the alleged *Brady* violation. (*Id.* at 132-45.) On September 13, 2017, the New

York Court of Appeals denied petitioner leave to appeal. (*Id.* at 146.)

The instant *pro se* petition followed on August 23, 2018 (ECF No. 1), and the State filed its response on January 29, 2019 (ECF No. 10).

### 3. Motion To Stay Petition

On January 29, 2020, petitioner moved this Court to stay his petition in order to allow him the opportunity to exhaust additional claims in New York state court. (ECF No. 17.) Specifically, he stated that his post-conviction counsel had filed a second N.Y. Crim. Proc. Law § 440.10 motion to vacate his judgment of conviction based on three grounds: (1) alleged, newly discovered *Brady* information—that is, the lead detective was implicated in coercing false confessions in two separate homicide cases—that was withheld from his 2014 hearing regarding his first Section 440.10 motion; (2) alleged newly discovered evidence that McKenzie was capable of unjamming a gun unaided and that McKenzie was the only person to fire or control the gun on the night of the shooting; and (3) alleged ineffective assistance of trial counsel due to trial counsel's failure to interview McKenzie. (*Id.* at 1-2.)

On September 14, 2020, this Court directed petitioner to file a letter by October 12, 2020, providing an update on petitioner's efforts to exhaust these additional claims. (ECF No. 20.) Petitioner failed to respond to that order. On June 30, 2021, the Court denied petitioner's motion for a stay and directed petitioner to file his reply with respect to the pending habeas petition on or before August 6, 2021. (ECF No. 21.) The order was returned as undeliverable and indicated on the envelope that petitioner had been paroled. (ECF No. 22 at 1.) No reply was received by the due date.

9

## II. STANDARD OF REVIEW

To determine whether a petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2554(d). "'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (alteration in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

The AEDPA establishes a deferential standard of review: "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit has added that, while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (alterations in original) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo.*'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

## III. DISCUSSION[3]

### A. Procedural Bar

#### 1. Legal Standard

A petitioner's federal claims may be procedurally barred from habeas review if they

---

[3] Although petitioner appears to have been paroled, (ECF No. 22 at 1), it is clear that a habeas petition does not become moot when parole is granted, *see, e.g., Jones v. Cunningham*, 371 U.S. 236, 243 (1963) (holding that release on parole does not

10

were decided at the state level on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729-33 (1991); *see, e.g., Michigan v. Long*, 463 U.S. 1032, 1041 (1983). A procedural rule is adequate if it is "'firmly established and regularly followed' by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). To be independent, the "state court must actually have relied on the procedural bar as an independent basis for its disposition of the case" by "'clearly and expressly' stat[ing] that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 261-63 (1989) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327-28 (1985)). "[A] state court that wishes to rely on a procedural bar rule in a one-line *pro forma* order easily can write that 'relief is denied for reasons of procedural default.'" *Id.* at 265 n.12. For example, an "appellate court's statement that petitioner's claim was 'unpreserved' is sufficient to establish that it was relying on a procedural bar as an independent ground in disposing of the issue." *Allan v. Conway*, No. 08–CV–4894 (JFB), 2012 WL 70839, at *9 (E.D.N.Y. Jan. 10, 2012); *see also Figueroa v. Grenier*, No. 02 Civ. 5444 DAB GWG, 2005 WL 249001, at *8 (S.D.N.Y. Feb. 3, 2005) (citing *Harris*, 489 U.S. at 265 n.12). In addition, a state court's reliance on an independent and adequate procedural bar precludes habeas review even if the state court also rejected the claim on the merits in the alternative. *See, e.g., Harris*, 489 U.S. at 264 n.10 (explaining that "a state court need not fear reaching the merits of a federal claim in an alternative holding," so long as the state court "explicitly invokes a state

procedural bar rule as a separate basis for decision"); *see, e.g., Glenn v. Bartlett*, 98 F.3d 721, 725 (2d Cir. 1996).

A federal habeas court may not review a procedurally barred claim on the merits unless the petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. A petitioner may demonstrate cause by showing one of the following: "(1) the factual or legal basis for a petitioner's claim was not reasonably available to counsel, (2) some interference by state officials made compliance with the procedural rule impracticable, or (3) the procedural default was the result of ineffective assistance of counsel." *McLeod v. Graham*, No. 10 Civ. 3778 BMC, 2010 WL 5125317, at *3 (E.D.N.Y. Dec. 9, 2010) (citing *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994)). Actual prejudice can be demonstrated by showing that the error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (quoting *Rodriguez v. Mitchell*, 252 F.3d 191, 203 (2d Cir. 2001)). A miscarriage of justice is demonstrated in extraordinary cases, such as where a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To overcome a procedural default based on a miscarriage of justice, the petitioner must demonstrate that "more likely than not, in light of the new evidence, no reasonable juror

---

render a habeas petition moot because "[w]hile petitioner's parole releases him from immediate physical imprisonment, it imposes conditions which significantly confine and restrain his freedom"); *accord Janakievski v. Exec. Dir.,*

*Rochester Psychiatric Ctr.*, 955 F.3d 314, 319 (2d Cir. 2020); *Ortiz v. Martisucello*, 16-CV-7927 (LAP) (OTW), 2018 WL 10468148, at *1 n.1 (S.D.N.Y. Aug. 23, 2018) (collecting cases).

would find him guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 538 (2006).

In addition, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A); *see also Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 808 (2d Cir. 2000) ("Prior to bringing a petition for *habeas corpus* pursuant to 28 U.S.C. § 2254, petitioner must exhaust the remedies available in state court or demonstrate that 'there is an absence of available State corrective process [or] [that] circumstances exist that render such process ineffective to protect the rights of the applicant.'" (alterations in original) (quoting 28 U.S.C. § 2254(b)(1)(B))). To fulfill the exhaustion requirement, a petitioner must "fairly present" the federal claim "in each appropriate state court (including a state supreme court with powers of discretionary review)." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). "A prisoner has not fairly presented a federal claim before a state court if the federal claim is not mentioned in the prisoner's state court brief." *Richardson v. Superintendent of Mid-Orange Corr. Facility*, 621 F.3d 196, 201 (2d Cir. 2010). However, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

## 2. Application

As noted above, the Second Department concluded that three of petitioner's arguments were "for the most part, unpreserved for appellate review." (ECF No. 11-2 at 131 (citing N.Y. Crim. Proc. Law § 470.05(2)).) These arguments included: (1) the alleged error

regarding the State's introduction of prior statements to impeach two prosecution witness; (2) the failure of the trial court to give a contemporaneous limiting instructions at the time the impeachment material was introduced; and (3) the State's reference to the prior statements during summation. (*Id.*)

### a. Alleged Impeachment of Witnesses

New York's preservation rule, N.Y. Crim. Proc. Law § 470.05(2), "require[s], at the very least, that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error." *Garcia*, 188 F.3d at 78 (quoting *People v. Luperon*, 85 N.Y.2d 71, 78 (1995)); *accord Richardson v. Greene*, 497 F.3d 212, 218 (2d Cir. 2007). The rule requires a contemporaneous objection to any alleged legal error by defense counsel at a criminal trial. *See* N.Y. Crim. Proc. Law § 470.05(2); *see also Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003). The rule is also a state law ground that is independent of any federal constitutional question that is "firmly established and regularly followed by the state." *Richardson v. Greene*, 497 F.3d at 217-19.

This Court agrees with the Second Department that petitioner failed to preserve the issue concerning the alleged impeachment of State witnesses for his direct appeal and, accordingly, for his instant habeas petition. Although it is true that petitioner objected to the State's attempted impeachment of Pottur during direct examination with Pottur's July 9 statement and the trial court rejected that objection because defense counsel "just started objecting" before the State "asked any foundational questions" (A. 260-61), the State did not pursue the line of questioning further during direct examination and, thus, no

objection was made at that juncture. (*See* A. 259-69.)   On re-direct, petitioner again objected when the State attempted to use Pottur's July 9 statement to refresh his recollection, arguing that the use of the July 9 statement was outside the scope of cross-examination into "a whole new area," but failed to argue that such use constituted an improper impeachment of the State's own witness in violation of N.Y. Crim. Proc. Law § 60.35. (*See* A. 282.)   Under New York law, however, "to preserve a particular issue for appeal, defendant must specifically focus on the alleged error." *Garvey v. Duncan*, 485 F.3d 709, 714-15 (2d Cir. 2007) (collecting New York cases). Here, because petitioner failed to contemporaneously object to the State's use of the July 9 statement to impeach Pottur, petitioner's claims based on the alleged violation of N.Y. Crim. Proc. Law § 60.35—including the State's elicitation of such impeachment testimony and the trial court's failure to issue a contemporaneous limiting instruction during Pottur's testimony—are procedurally barred from habeas review.[4] Moreover, petitioner has failed to demonstrate cause or prejudice or actual innocence to overcome this procedural bar.

### b. Sufficiency of the Evidence at Trial

Petitioner alleges in his habeas petition that there was insufficient evidence to support the state court verdict beyond a reasonable doubt. (ECF. No. 1 at 8.) As noted above, to fulfill the exhaustion requirement, a petitioner must "fairly present" the federal claim "in each appropriate state court (including a state supreme court with powers of discretionary review)." *Baldwin*, 541 U.S. at 29.   "A

prisoner has not fairly presented a federal claim before a state court if the federal claim is not mentioned in the prisoner's state court brief." *Richardson v. Superintendent of Mid-Orange Corr. Facility*, 621 F.3d at 201. A habeas court may excuse a petitioner's failure to exhaust if petitioner demonstrates "cause and prejudice excusing his failure to exhaust or actual innocence." *Dixon v. McGinnis*, No. 06 CIV. 39 (RJS), 2012 WL 6621728, at *4 (S.D.N.Y. Dec. 19, 2012); *see also Murden v. Artuz*, 497 F.3d 178, 194 (2d Cir. 2007) (citing *Dretke v. Haley*, 541 U.S. 386, 393 (2004)).

The Court finds that petitioner's claim is unexhausted; there is no record that he raised his legal insufficiency of the evidence claim in his post-judgment Section 440.10 motion or in his consolidated direct appeal.   Moreover, petitioner has not attempted to show cause and prejudice excusing his failure to exhaust or actual innocence. *See Murden*, 497 F.3d at 194. Accordingly, the claim is unexhausted. However, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(2); *see also Jones v. Keane*, 329 F.3d 290, 294 n.6 (2d Cir. 2003), which the Court addresses below.

### B.  Merits

Out of an abundance of caution, the Court has analyzed all of petitioner's claims in this case, and concludes that all such claims (including the procedurally-barred and unexhausted claims in the current petition) fail on the merits.   Given that petitioner's claims present no constitutional basis for habeas

---

[4] Petitioner's motion for a mistrial following Pottur's testimony on the grounds that the State's redirect went outside the scope of cross-examination and that the State impeached its witness, and, the following day, petitioner's

motion for a curative instruction regarding the State's impeachment of Pottur, likewise failed to failed to satisfy New York contemporaneous objection rule. *See* N.Y. Crim. Proc. Law § 470.05(2).

relief, for the reasons discussed below, the Court denies the habeas petition in its entirety on the merits.

### 1. State's Alleged Improper Use of Impeachment Evidence

Petitioner asserts that he is entitled to habeas relief because the State improperly impeached two of its witnesses during trial in violation of N.Y. Crim. Proc. Law § 60.35 and, relatedly, that the trial court erred by failing to issue a curative instruction during and following the testimony of Pottur. (ECF No. 1 at 5.) In addition, petitioner alleges ineffective assistance of counsel due to his lawyer's failure to object to the use of such impeachment evidence during the State's summation. (*Id.*) The Court concludes that, in addition to being procedurally barred, petitioner's claims on this issue do not warrant habeas relief.

New York Criminal Procedure Law § 60.35 states:

> 1. When, upon examination by the party who called him, a witness in a criminal proceeding gives testimony upon a material issue of the case which tends to disprove the position of such party, such party may introduce evidence that such witness has previously made either a written statement signed by him or an oral statement under oath contradictory to such testimony.

> 2. Evidence concerning a prior contradictory statement introduced pursuant to subdivision one may be received only for the purpose of impeaching the credibility of the witness with respect to his testimony upon the subject, and does not constitute evidence in chief. Upon receiving such evidence at a jury trial, the court must so instruct the jury.

N.Y. Crim. Proc. Law § 60.35(1)-(2).

The propriety of a trial court's decision to admit impeachment testimony under Section 60.35 is not cognizable on habeas review. *See Gueits v. Kirkpatrick*, 612 F.3d 118, 124 (2d Cir. 2010); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006); *Harris v. Perez*, 14-CV-7218 (SLT), 2017 WL 5468782, at *5 (E.D.N.Y. Nov. 13, 2017) ("Since § 60.35's provisions are not mandated by federal law or the United States Constitution, a trial court's error in applying these [sic] provision is solely an error of state law."); *Dunston v. Griffin*, 16-CV-821 (BMC), 2016 WL 1255727, at *4 (E.D.N.Y. Mar. 29, 2016) (holding claim under Section 60.35 was not cognizable on habeas review because "[t]he U.S. Constitution places no restrictions on a prosecutor's ability to impeach his own witness"). Instead, a habeas petitioner can prevail on an evidentiary error claim only if "[he] show[s] that the error deprived [him] of a *fundamentally fair* trial." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983); *see also Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) ("[E]rroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a *fundamentally fair* trial.'" (quoting *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988))). In other words, "[t]he introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Dunningan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)), *abrogated on other grounds by Perry v. New Hampshire*, 565 U.S. 228 (2012).

Here, even assuming *arguendo* that the admission of the prior statements for impeachment purposes under Section 60.35 was erroneous,[5] it is clear that such an error did not rise to the level of a constitutional violation that could support habeas relief.   First, although the trial court did not provide a limiting instruction during or directly after Pottur's testimony, it did provide a limiting instruction following Anthony Rich's testimony and, most importantly, again provided such instruction in its charge to the jury before deliberations.   (*See* A. 340-41, 801, 803-05.)   Second, there was overwhelming evidence of petitioner's guilt established by admissible testimony from multiple witnesses and other evidence such that the passing references to the prior statements of these two witnesses could not possibly have deprived petitioner of a fundamentally fair trial or affected the outcome of the case.   In sum, any alleged error in the admission of prior statements under Section 60.35 does not warrant habeas relief.

\* \* \*

Petitioner's ineffective assistance of counsel claim based upon his lawyer's failure to object to the use of such impeachment testimony during summation likewise lacks merit.   In order to demonstrate a Sixth

Amendment claim for ineffective assistance of counsel, "a petitioner must demonstrate both that counsel's performance was deficient and that prejudice resulted from the deficient performance."   *Gueits*, 612 F.3d at 122 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).   To establish deficient performance, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness."   *Strickland*, 466 U.S. at 688.   The Second Circuit has recognized, however, that "[u]nder *Strickland*, there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"   *Palacios v. Burge*, 589 F.3d 556, 561 (2d Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).   To establish prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Strickland*, 466 U.S. at 694.

The performance of petitioner's counsel was not deficient based upon his failure to object to the use of impeachment evidence during summation.   Evidence that the "gun jammed" and that petitioner helped McKenzie with unjamming the gun was properly admitted into evidence through the testimony of Anthony Rich, who witnessed the events firsthand.   (*See* A. 309-10 (testifying that

---

[5] Although the Court assumes error for purposes of this habeas petition, the Court notes that it is far from clear that the challenged questioning was a violation of state law under Section 60.35. In other words, it appears that the State was properly permitted to impeach both Pottur and Anthony Rich with their previously signed police statements because their trial testimony "tend[ed] to disprove the [State's] position." *See People v. Berry*, 27 N.Y.3d 10, 17 (2016) (internal quotation marks omitted). Pottur testified that he assumed the gun jammed, which was inconsistent with his prior statement to police that the gun in fact jammed.

Similarly, Anthony Rich testified that there was a tussle with the gun where petitioner and McKenzie "pull[ed] the gun back and forth" until it unjammed, which was inconsistent with his prior statement to police that petitioner "grabbed the gun and un-jammed it" (A. 328-30)—suggesting that petitioner cleared the jam on his own. Since the testimony in question directly addressed the State's theory of the accessorial liability—a key issue at trial—any testimony negating petitioner's participation in the handling of the gun was adverse to the State's case and could be impeached with prior statements.

McKenzie said "sh*t the gun jammed" and that he then saw petitioner and McKenzie "pull[] the gun back and forth" until he "heard the snap of it un-jamming").)     In addition, two additional witnesses—Timothy Rich and his girlfriend—each testified that, following the shooting, petitioner stated that he "un-jammed" the gun for McKenzie. (*See* A. 348, 382-83.) Moreover, a third witness, Wilfred Stevens, testified that, in the days following the shooting, petitioner stated that he was "involved in a shooting" and asked, "[H]ow long does it take for gun powder to come off your hands?" (A. 430-31.) Therefore, any reference to Pottur's impeachment testimony—*i.e.*, that he previously told the police that the "gun jammed" even though he did not see the events (A. 283-84)—was proper.

And, importantly, the State did not use Anthony Rich's previous police statement—that petitioner "grabbed the gun and un-jammed it" (A. 328)—during summation. Instead, the State properly used Anthony Rich's statement that there was a tussle for the gun until he "heard the snap of it un-jamming" (A. 309, 758-59).     It therefore was not a deficient performance by petitioner's counsel to fail to object to the use of such admissible testimony during the State's summation.

In any event, as noted above, the Second Department correctly held that, to the extent petitioner's contentions have any merit, any error was harmless, as there was no significant probability that the error contributed to defendant's conviction in light of the overwhelming evidence of his guilt. (ECF No. 11-2 at 131.) Accordingly, petitioner's claim regarding the impeachment evidence fails on the merits.

### 2.  Missing Witness Charge

Petitioner next argues that habeas relief is appropriate because the trial court did not instruct the jury that it could draw an adverse inference from the State's failure to call co-defendant McKenzie as a witness a trial. (ECF No. 1 at 6.)   The Court concludes, however, that petitioner's claim does not raise a federal constitutional issue that is cognizable on habeas review.

"Whether a missing witness charge should be given lies in the sound discretion of the trial court." *Reid v. Senkowski*, 961 F.2d 374, 377 (2d Cir. 1992) (quoting *United States v. Torres*, 845 F.2d 1165, 1170-71 (2d Cir. 1988)); *see also People v Macana*, 84 N.Y.2d 173, 179-80 (1994). The Second Circuit has explained that, "[b]ecause we recognize that an aura of gamesmanship frequently accompanies requests for missing witness charges, we afford [trial] judges considerable discretion in deciding when they should and should not be given." *United States v. Gaskin*, 364 F.3d 438, 463 (2d Cir. 2004) (citation and internal quotation marks omitted). To obtain a missing charge under New York law, the requesting party must establish that: (1) "the witness's knowledge [is] material to the trial"; (2) "the witness [is] expected to give noncumulative testimony favorable to the party against whom the charge is sought"; and (3) "the witness [is] available to that party." *People v. Savinon*, 100 N.Y.2d 192, 197 (2003).  The burden is upon the party seeking the charge to prove that the witness is not only knowledgeable about a material issue, but also that the witness would be expected to testify favorably for the party not calling the witness and that the witness' testimony would be non-cumulative.   *See People v Gonzalez*, 68 N.Y.2d 424, 427 (1986). In New York, the State's "failure to call a witness will allow the jury to infer that the witness would contradict the testimony of the

16

[State's] other witness(es) and corroborate the version of the defendant." *Savinon*, 100 N.Y.2d at 197 n.2. (alterations and internal quotation marks omitted).

Moreover, as it relates to habeas review, the failure to provide a missing witness charge in accordance with New York law is a matter of state law for which habeas relief is unavailable. *See, e.g.*, *Kirkby v. Filion*, 644 F. Supp. 2d 299, 307 (W.D.N.Y.2009) ("Kirkby's missing witness charge claim raises only an issue of state law that cannot justify federal habeas relief."). Instead, on habeas review, the Court may consider only whether the failure to provide a missing witness charge violated petitioner's federal constitutional rights. "Like the failure to give any other jury instruction, the failure to issue a missing witness instruction does not raise a constitutional issue and cannot serve as the basis for federal habeas relief unless the failure 'so infected the entire trial that the resulting conviction violated due process.'" *Kloskin v. Conway*, 501 F. Supp. 2d 429, 444 (W.D.N.Y. 2007) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Finally, "[w]here, as here, the alleged error is one of omission, it 'is less likely to be prejudicial than a misstatement of the law,' thereby making the petitioner's 'burden . . . especially heavy.'" *Crews v. Herbert*, 586 F. Supp. 2d 108, 114 (W.D.N.Y. 2008) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).

As an initial matter, it is unclear whether the circumstances of petitioner's case even warranted a missing witness charge. Specifically, based on this Court's review of the record, there is no reason to believe that McKenzie would have given non-cumulative testimony favorable to petitioner. Anthony Rich and Pottur were present during the shooting that resulted in the death of Jerry Armstrong on June 1, 2009—as was McKenzie, the shooter. *See Davis v. Mantello*,

42 F. App'x 488, 491-92 (2d Cir. 2002) (finding testifying witness and missing witness were together throughout duration of the crime, and missing witness therefore would have added no new information). Petitioner presents no evidence that McKenzie would have testified to a version of the shooting that was materially different than the version provided by the other witnesses. Thus, petitioner failed to demonstrate that the Second Department erred in concluding that the trial court did not abuse its discretion in declining to give missing witness charge. *See Gaskin*, 364 F.3d at 463 (quoting *United States v. Torres*, 845 F.2d at 1170-71); *see also Reid*, 961 F.2d at 377.

More importantly, even if the failure to give a missing witness instruction violated New York law in this case, there is no basis to conclude that such error was of a constitutional magnitude warranting habeas relief. It is entirely speculative to suggest that the failure by the court to give a missing witness charge had any impact on the trial. Indeed, despite at least six sustained objections by the State during summation, defense counsel repeatedly argued to the jury the absence of McKenzie from the State's case-in-chief. (A. 704-05, 710-11, 725, 734.) Moreover, as noted above, there was overwhelming evidence of petitioner's guilt. In short, the Court cannot conclude that the failure to give a missing witness instruction violated petitioner's federal constitutional rights by "so infect[ing] the entire trial as to deny [p]etitioner due process." *Hernandez v. Lee*, No. 10–CV–4667 (JFB), 2014 WL 1407274, at *17 (E.D.N.Y. Apr. 11, 2014); *see, e.g., Davis v. Smith*, No. 06–CV–1389 (JKS), 2009 WL 236506, at *7 (N.D.N.Y. Feb. 2, 2009) ("Even if state law had called for the missing witness charge, its absence certainly did not so infect the entire trial as to deny Petitioner due process where, as here, the prosecutor's comments during his opening statement were equivocal, defense counsel was

permitted to comment on the absence of any eye-witness testimony during summation, and the jury was instructed to limit itself to the evidence actually presented."); *Toland v. Walsh*, No. 04–CV0773 (GLS), 2008 WL 65583, at *14-15 (N.D.N.Y. Jan. 4, 2008) (denying habeas relief where possibility that missing witness would give favorable testimony was "based upon nothing other than mere conjecture" and stating that "federal habeas relief cannot be granted upon claims that are rooted in speculation"); *Brown v. Spitzer*, No. 05 Civ. 1553 (BMC), 2007 WL 2406870, at *3 (E.D.N.Y. Aug. 21, 2007) (denying habeas relief in part because "failure to give a missing witness charge will rarely support reversal or habeas relief since reviewing courts recognize the aura of gamesmanship that frequently accompanies requests for a missing witness charge as to which the trial judge will have a surer sense than any reviewing court" (citation and internal quotation marks omitted)).      Accordingly, petitioner's claim as to the missing witness charge does not provide a basis for habeas relief.

### 3.  Sufficiency and Weight Of Evidence

Petitioner also argues that his conviction was against the weight and sufficiency of the evidence.   (ECF No. 1 at 8.)   The Court disagrees.

The law governing habeas relief from a state conviction based on insufficiency of the evidence is well established.   A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in an application for a writ of habeas corpus. *Einaugler v. Sup. Ct. of the State of N.Y.*, 109 F.3d 836, 840 (2d Cir. 1997) (quoting *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)).   A criminal conviction in state court will not be reversed if, "after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Policano v. Herbert*, 507 F.3d 111, 115-16 (2d Cir. 2007) (stating that "[i]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt" (quoting *Jackson*, 443 U.S. at 324)); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial.").      A criminal conviction will stand so long as "a reasonable mind 'might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)).   Even when "faced with a record of historical facts that supports conflicting inferences[,] [a court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolves any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994) (quoting *Jackson*, 443 U.S. at 326). When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

This Court concludes that there was more than sufficient evidence for the jury to convict petitioner of murder in the second degree in violation of New York Penal Law § 125.25(2).

In New York, a person is guilty of murder in the second degree when the following elements are proven beyond a reasonable doubt: "Under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person." N.Y. Penal Law § 125.25(2).

This Court concludes that there was legally sufficient evidence—both testimonial and physical evidence—to sustain a conviction for depraved indifference murder. With respect to the trial testimony, multiple witnesses testified that petitioner was present at the shooting and that petitioner assisted with unjammed the gun midway through the shooting. In particular, Anthony Rich testified that, in the midst of the shooting, he heard McKenzie yell "sh*t the gun jammed" and then saw petitioner and McKenzie "pulling the gun back and forth" until he heard another bullet "snap" into the chamber as the gun "un-jamm[ed]." (A. 309-11, 330-31.) Pottur corroborated Anthony Rich's testimony, by also placing petitioner at the scene of the crime and stating that, during the shooting, he "heard a fuss" and "assum[ed] the gun jammed." (A. 281.) Likewise, Timothy Rich and his girlfriend each testified that, following the shooting, petitioner admitted to helping unjam the gun. (A. 348, 382-83.) Similarly, Wilfred Stevens testified that petitioner admitted he was "involved in a shooting" and that he asked Stevens, "[H]ow long does it take for gun powder to come off your hand?" (A. 430-31.)

There was also ample physical evidence to corroborate the testimonial evidence. The police recovered ten shell casings and one unfired cartridge from near the property at 119 Irving Avenue. (A. 479-83, 597-98.) The State's forensic expert testified that all of the bullets and casings, including the bullet

recovered from the body of Jerry Armstrong, were ejected from the same gun, and that an unfired cartridge, like the one recovered on the property, could be ejected from the gun in order to clear a jam. (A. 598-602, 605, 625-26.)

Moreover, Anthony Rich and Pottur each testified that McKenzie had permanently "disabled" his right hand in a childhood accident (A. 242-43, 314), which was corroborated by the officer processing the arrest, who testified that McKenzie's right hand could not be scanned for fingerprints because it could not lie flat during booking. (A. 551-54.) The State's forensic expert also testified that it would be "virtually impossible" to clear a jammed gun with one hand. (A. 625-26.)

In sum, there was more than sufficient evidence from which a rational jury could convict petitioner of murder in the second degree beyond a reasonable doubt. Accordingly, there is no basis for habeas relief based upon the sufficiency of the evidence.

\* \* \*

The Court also rejects petitioner's claim that the verdict was against the weight of the evidence. (ECF No. 1 at 8.) A New York state appellate court may reverse or modify a conviction if the court determines that the jury's verdict "was, in whole or in part, against the weight of the evidence." N.Y. Crim. Proc. Law § 470.15(5). By way of contrast to a sufficiency-of-the-evidence claim, the state court considering the weight of the evidence has the power to set aside a guilty verdict where it determines that the evidence against the defendant is not credible. *See People v. Bleakley*, 69 N.Y.2d 490, 495 (1987); *see also Hatcher v. Heath*, No. 10-CV-782 (JG), 2011 WL 4710854, at *8 (E.D.N.Y. Oct. 4, 2011). "The argument that the jury's verdict was

contrary to the weight of the evidence, however, does not raise a question of federal due process, and is not cognizable on a habeas petition." *Hatcher*, 2011 WL 4710854, at *8 (citing *Young v. Abrams*, 698 F.2d 131, 135 (2d Cir. 1983)).

In any event, the jury verdict was not against the weight of evidence. Petitioner only argues that the testimony of Wilfred Stevens was not credible. (ECF No. 1 at 8.) However, even without the testimony of Wilfred Stevens, as discussed above, there was overwhelming evidence that petitioner, acting in concert with McKenzie, evinced a depraved indifference to human life when he recklessly assisted in shooting at a house with multiple people standing in front, which thereby caused the death of Jerry Armstrong, in violation of New York Penal Law § 125.25(2).

### 4. *Brady* Claim

Petitioner also argues that he is entitled to habeas relief because the State failed to disclose that Timothy Rich was a police informant prior to the shooting and at the time of his trial testimony in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (ECF No. 1 at 9.) The court denied the post-trial motion on this ground, concluding that the State should have disclosed that Timothy Rich was working as an active cooperator because police detectives knew about his status as an informant at the time they questioned him about the shooting (A. 1167), but that there was no "reasonable probability" that the outcome of the trial would have been different had the information been disclosed to defense counsel (A. 1168-69). The Second Department agreed that there was no reasonable probability that such nondisclosure affected the outcome of the trial. (ECF No. 11-2 at 131.) This Court agrees as well.

It is well established that prosecutors have a clear and unconditional duty to disclose all material, exculpatory evidence to the defense. *See Brady*, 373 U.S. at 87. "This duty exists whether or not the defense requests exculpatory evidence." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (citing *United States v. Bagley*, 473 U.S. 667, 681-82 (1985)); *see also Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (applying *Brady* to impeachment evidence). In order to demonstrate a *Brady* violation, "a defendant must show that: (1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

As an initial matter, the State does not dispute the first two prongs of *Brady*—i.e., that Timothy Rich's informant status constituted *Brady* material—but argues that petitioner was not prejudiced by the nondisclosure. (ECF No. 10-1 at 28-31.) The Court therefore only addresses whether petitioner was prejudiced by the State's failure to disclose the impeachment evidence.

"To establish prejudice, a plaintiff must show that the evidence was material." *Lewis*, 790 F.3d at 124. "The touchstone of materiality is a reasonable probability of a different result[.]" *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001) (alteration omitted) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is

accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).

Here, given the overwhelming evidence of petitioner's guilt, the State's failure to disclose the impeachment evidence regarding Timothy Rich's status as an informant does not undermine confidence in the outcome of the trial. As noted in detail above, multiple witnesses testified that petitioner was involved in the shooting and assisted—either jointly or individually—with clearing the gun when it jammed. (*See* A. 281, 309-11, 330-31, 348, 382-83, 430-31.) There was also substantial physical evidence used by the State to support the testimony of these witnesses. (*See* A. 479-83, 597-602, 605, 625-26.) And, as the State notes, Timothy Rich mostly provided background testimony regarding the events leading up to the shooting, which were corroborated by other witnesses and uncontested. *See Strickler*, 527 U.S. at 293 (explaining that the existence of corroborating evidence lessened the materiality of undisclosed impeachment evidence). Moreover, Timothy Rich was not present at the shooting and, with respect to the elements of the crime, only testified that, following the shooting, petitioner stated that he had "un-jammed" the gun. (A. 382-83.) Thus, even if Timothy Rich had been effectively impeached (or had not testified at all), there is no basis conclude that the outcome would have been different given the overwhelming evidence established through the other witnesses and physical evidence. Accordingly, petitioner's claim for habeas relief on the basis of withheld *Brady* material is without merit.

## VI. Conclusion

For the reasons set forth above, the Court concludes that petitioner failed to demonstrate

any basis for habeas relief under 28 U.S.C. § 2254. His petition for a writ of habeas corpus is therefore denied in its entirety. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). In addition, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

/s/Joseph F. Bianco

JOSEPH F. BIANCO
United States Circuit Judge
(sitting by designation)

Dated: August 9, 2021
Central Islip, New York

\* \* \*

Petitioner is proceeding *pro se*. Respondent is represented by Caren C. Manzello, Assistant District Attorney, *for* Timothy Sini, District Attorney of Suffolk County, 200 Center Drive, Riverhead, New York, 11901.